PACHULSKI STANG ZIEHL & JONES LLP
Debra I. Grassgreen (CA Bar No. 169978)
Jason H. Rosell (CA Bar No. 269126)
One Sansome Street, Suite 3430
San Francisco, California 94104
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
E-mail: dgrassgreen@pszjlaw.com
jrosell@pszjlaw.com

[Proposed] Counsel to the Debtor

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>INTERNATIONAL LONGSHORE<br>AND WAREHOUSE UNION,<br><br>Debtor. | Case No. 23-30662-HLB<br><br>Chapter 11<br><br>**DECLARATION OF WILLIAM E. ADAMS IN SUPPORT OF FIRST DAY MOTIONS** |

I, William E. Adams, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the President of the above-captioned debtor and debtor in possession (the "Debtor" or "ILWU"). I was elected President in October 2018 and re-elected in October 2021. Prior to being elected President, I served as the Secretary-Treasurer of the ILWU for five terms from 2003 to 2018. I began my career as a longshore worker at the Port of Tacoma in Washington in 1978 and became a full member of ILWU Local 23 in 1986. In 1998, I became a member of Local 23's executive board.

2. As President, I am the executive officer of the ILWU and responsible for the day-to-day operations, business, and financial affairs of the ILWU. I am familiar with the ILWU's operations and books and records, which are maintained in the ordinary course of business by the Secretary-Treasurer. Except as otherwise indicated, all facts set forth in this declaration are based on (a) my personal knowledge of the Debtor's employees, operations, and finances; (b) information learned from my review of relevant documents; (c) information supplied to me by other members of the Debtor's

management team and its advisors; or (d) my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition.

3. I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtor. If called upon, I could and would testify competently to the facts set forth herein.

4. I submit this declaration in accordance with (a) the United States Bankruptcy Court for the Northern District of California's *First Day Motion Guidelines for Chapter 11 Cases* and (b) Rule 9013-1(d) of the Bankruptcy Local Rules for the Northern District of California (the "Local Rules"). This declaration is intended to provide (a) an overview of the Debtor, its business, and the events precipitating the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case") and (b) evidentiary support for the Debtor's first day motion filed contemporaneously herewith.

5. On September 30, 2023 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California (San Francisco Division) (the "Bankruptcy Court"). The Debtor commenced its Chapter 11 Case to effectuate a reorganization of its capital structure under subchapter V of the Bankruptcy Code.

6. In order to minimize operational disruptions in connection with its transition into bankruptcy, the Debtor has filed (a) a motion to maintain its cash management system in the ordinary course of business and (b) a motion to continue honoring its employee and payroll obligations in the ordinary course of business (together, the "First Day Motions"). I am familiar with each First Day Motion and believe that the relief requested in each is necessary to enable the Debtor to operate in chapter 11 with minimal disruption and is critical to enable the Debtor to continue to operate in the ordinary course of business. Accordingly, granting each First Day Motion is in the best interest of the Debtor's estate and its creditors. The facts set forth in each First Day Motion are incorporated herein by reference.

7. This declaration is organized into four (4) sections: (a) Section 1 provides background information about the Debtor; (b) Section 2 describes the events leading up to the filing of this Chapter 11 Case; (c) Section 3 generally describes the Debtor's plan of reorganization, to be filed shortly after

the First Day Motions, and (d) Section 4 sets forth the relevant facts in support of each First Day Motion.

## SECTION I
## BACKGROUND INFORMATION

**A. History and Objectives**

8. The ILWU is organized under the laws of the State of California as a non-profit labor organization that is exempt from federal income tax under section 501(c)(5) of the Internal Revenue Code. The ILWU was formed in 1937 and adopted its *Constitution*, which is its governing document, in 1938. The Constitution has been amended throughout the years by the International Convention, the ILWU's highest governing body, with the latest version dated as of June 2021 (the "Constitution").

9. The Constitution sets forth the following objectives of the ILWU:

   i. First, to unite in one organization, regardless of religion, race, creed, color, gender, sexual orientation, political affiliation or nationality, all workers within the jurisdiction of this International.

   ii. Second, to maintain and improve the wages, hours and working conditions of all its members without discrimination.

   iii. Third, to educate the membership of the organization in the history of the American labor movement and in present day labor problems and tactics.

   iv. Fourth, to secure legislation in the interests of labor and to oppose anti-labor legislation.

10. Since its formation in 1937, the ILWU has grown to approximately 40,000 diverse members in over 50 locals and affiliates throughout California, Washington, Oregon, Alaska, Hawaii, and Canada. The local and affiliate unions are separate legal autonomous entities and are not debtors (or otherwise involved) in this Chapter 11 Case.

11. The ILWU's members include workers employed in, among other industries, the (a) loading and unloading of vessels, rail, and trucks at ports; (b) warehousing, wholesaling, and distribution industries (including mining); (c) operation of tugs, towboats, barges, and ferries; (d) agriculture and aquaculture (including processing, transportation, and distribution) industries; (e) tourist industry (including hotels, resorts, and restaurants); (f) wholesale and retail trade, general manufacturing, and food processing; and (g) service industries (including hospitals and health care

facilities, financial and insurance operations, newspapers, restaurants, breweries, early childhood education, etc.).

12. The ILWU facilitates the organization of local unions and affiliates and assists them with the negotiation and administration of collective bargaining agreements. In furtherance of its objectives, the ILWU also provides (a) a monthly newspaper and other communications to its membership, (b) education and training to its membership, locals, and affiliates, (c) lobbies in the furtherance of the ILWU values and for the benefit of the locals and affiliates, and (d) engages in organizing activities to introduce workers to local unions and affiliates.

**B.     Governance**

13. The highest governing body of the ILWU is the International Convention (the "Convention"), which meets every three (3) years and is composed of delegates elected by direct rank-and-file votes in each local union or affiliate. The Convention adopts resolutions and statements of policy on political, economic, and other issues and amends the Constitution when and where appropriate. The Titled Officers (defined below) and International Executive Board Members (23 individuals) are nominated at the Convention and elected later in direct rank-and-file vote by secret ballot.

14. The International Executive Board meets at least three (3) times a year and is the highest governing body of the ILWU when Conventions are not in session. The International Executive Board takes all actions necessary to implement the Constitution and Convention decisions. The International Executive Board has a standing committee of four (4) trustees (the "Trustees"), elected by the International Executive Board from among its members. The Trustees examine and check the books and finances, review financial statements, and make recommendations to the International Executive Board.

15. The ILWU is managed by the President (myself); three (3) other Titled Officers (Robert Olvera, Jr., Vice President, Mainland; Paul (Sam) Kreutz, Vice President, Hawaii; and Edwin R. Ferris, Secretary-Treasurer); and the International Executive Board.

C.  **Employees**

16. The ILWU has approximately 25 employees that consist of the Titled Officers, field staff, professional staff, and clerical staff. Their functions include (a) conducting and supporting the day-to-day operations of the ILWU; (b) providing support and education to local union leadership and the membership; (c) facilitating communications with and among the local unions and membership; (d) performing organizing activities; (e) implementing the ILWU's policies and programs; (f) maintaining the ILWU's finances; (g) lobbying activities on the local, state, and national level to support the ILWU's objectives; and (h) human resources and legal support.

D.  **Capital Structure**

17. The ILWU's only material asset is its cash on hand, generated by per capita payments by local unions and affiliates, which as of the Petition Date is approximately $9.5 million.

18. In general, the ILWU's locals and affiliates pay per capita to the ILWU on a monthly basis. The per capita paid by a local union or affiliate is based on (a) the number of members the local union or affiliate had that month and (b) each member's hourly rate of pay.

19. The ILWU also derives *de minimis* revenue from other sources, including interest on its cash and intellectual property licensing fees related to a credit card program.

20. The ILWU's expenses primarily relate to its operation (administering the Constitution and the procedures and processes set forth therein), program services (support to locals, education, organizing, and conventions and other meetings), and administrative support services. A true and correct copy of the Debtor's most recent (a) balance sheet, (b) income statement, (c) cash flow statement, and (f) federal income tax return is attached to the petition.

21. As reflected in the foregoing, the Debtor does not have any secured debt. Moreover, the Debtor believes it is current on its accounts payable and the only material claim against it arises from the *pending* ICTSI Litigation (defined below).

## SECTION II

## EVENTS LEADING TO THE BANKRUPTCY

22. Historically, the Debtor has been a financially sound and stable organization, primarily funded, as discussed above, by per capita payments from local unions and affiliates. However, in 2012,

ICTSI Oregon, Inc. ("ICTSI") sued the Debtor and International and Longshore Warehouse Union Local 8 (Portland, Oregon) ("Local 8") in the U.S. District Court, District of Oregon (the "ICTSI Litigation") for alleged unlawful labor practices, including work stoppages and slowdowns at the Port of Portland terminal. The ICTSI Litigation is captioned *ICTSI Oregon, Inc. v. International Longshore and Warehouse Union*, Case No. 3:12-cv-1058-SI.

23. In November 2019, a jury trial verdict was reached against the Debtor, finding the Debtor and Local 8 had caused damages to ICTSI of approximately $94 million. The jury concluded that 55% of those damages were the responsibility of the Debtor and 45% were the responsibility of Local 8. The court, however, granted the Debtor's request to delay entry of the judgment pending resolution of their post-trial motions, including a renewed motion for judgment as a matter of law and a motion for a new trial.

24. On March 5, 2020, the court found the maximum damages supported by the evidence was $19,061,248, and ordered ICTSI to decide by March 19, 2020, whether it would accept that reduced amount or proceed with a new trial.

25. On April 1, 2020, **after ICTSI rejected the reduced damages amount**, the Debtor requested the court to (1) stay the case and permit the Debtor to appeal the court's denial of its motion for judgment as a matter of law and (2) reconsider its decision to limit the new trial to damages.

26. In May 2020, the court denied the Debtor's motion to reconsider but granted the Debtor leave to seek an interlocutory appeal of the court's denial of its motion for judgment as a matter of law.

27. In September 2020, the Ninth Circuit Court of Appeals (the "Ninth Circuit") granted the Debtor's petition to file an interlocutory appeal and granted ICTSI's cross-petition to file its own interlocutory appeal.

28. On January 18, 2022, the Ninth Circuit dismissed both appeals for lack of jurisdiction, and **a new trial on damages was scheduled**. The trial is scheduled for late February 2024.

29. The ICTSI Litigation has been lengthy and contentious. The Debtor estimates that it will need to incur more than $8.5 million in **additional** legal fees and related expenses through the conclusion of the new damages trial and any related appeals. The Debtor simply cannot sustain the

cost of litigation related to the new trial. Moreover, in light of the previous trial, any damages awarded to ICTSI will likely exceed any cash reserves the Debtor may have after trial and the ILWU will not be able to provide vital services to its members. For example, as recently as September 29, 2023, the ICTSI has asserted damages between $48 million and $142 million in connection with the ICTSI Litigation. As a result, the Debtor has decided to commence this Chapter 11 Case to immediately address the ICTSI Litigation and associated liability and emerge as a stronger labor organization, to the benefit of the ILWU's 40,000+ members.

## SECTION III

## CHAPTER 11 PLAN OF REORGANIZATION

30. On October 2, 2023, the Debtor filed its *Plan of Reorganization for Small Business Under Chapter 11* (the "Plan"). Pursuant to the Plan, the Debtor proposes to pay ICTSI on account of the ICTSI Litigation and any associated claims, substantially all of its cash on hand (the "GUC Fund"), except for a reserve for working capital necessary to enable the ILWU to maintain its operations and rebuild.

31. As set forth more fully in the Plan, the Debtor's projected disposable income for the next 5-years is **less than** the GUC Fund. In addition, the GUC Fund is **more than** the liquidation value of the Debtor. Accordingly, I understand that, pursuant to the Plan, ICTSI will receive more than it is otherwise entitled to under the Bankruptcy Code – which should pave the way for an expedited exit from bankruptcy.

## SECTION IV

## FIRST DAY MOTIONS

32. As discussed above, concurrently with the filing of this declaration, the Debtor filed the First Day Motions, which seek the entry of orders that grant various forms of relief intended to stabilize the Debtor's business operations and facilitate a smooth transition into bankruptcy. Specifically, on the Petition Date, the Debtor filed the following First Day Motions:

   i. **Cash Management Motion**. *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief.*

    ii.  **Employee Wage and Benefits Motion**. *Debtor's Emergency First Day Motion for Interim and Final Orders Authorizing Debtor to Honor Prepetition Obligations to Employees.*

33. The First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Bankruptcy Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate.

34. I am familiar with the information contained in each First Day Motion and believe that the relief sought in each such motion (a) is necessary to the uninterrupted going concern operations of the Debtor and (b) best serves the Debtor's estate and its creditors' interests.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: September 30, 2023
San Francisco, California

*William E. Adams*
William E. Adams, President